FILED
99 NOV 29 PM 2:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

THOMAS WAYNE SIBLEY,

Plaintiff,

vs.

UNUM LIFE INSURANCE COMPANY OF AMERICA,

Defendant.

CV 99-BU-0052-M

ENTERED
NOV 29 1999

MEMORANDUM OPINION

This case is presently pending before the Court on Defendant's Motion for Summary Judgment. (Doc. 15).

Plaintiff, Thomas Wayne Sibley, filed a Complaint, pursuant to 29 U S.C. § 1132(a)(1)(B), seeking benefits under an ERISA [Employee Retirement Income Security Act] plan providing supplemental benefits for long-term disability. Defendant, UNUM Life Insurance Company of America [hereinafter UNUM], contends that it properly denied payment of benefits under the supplemental policy.

For the reasons set forth below, this Court finds there are no disputed issues of material fact and that UNUM is entitled to judgment as a matter of law. Therefore, UNUM's Motion for Summary Judgment is due to be granted.



22

## I. SUMMARY JUDGMENT STANDARD

Summary judgment provides the parties an opportunity to test the mettle of their case before trial. On a motion for summary judgment, this Court must assess the entire record in order to ascertain whether there is a genuine need for a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)(quoting Advisory Committee Note to 1963 Amendment to Fed. R. Civ. P. 56(e)). Summary judgment is appropriate only if the Court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying evidence in the record that it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party's burden is not meager; it must illuminate for the Court the reasons why the non-moving party cannot or does not raise a genuine issue of material fact sufficient to support a trial. *Clark*, 929 F.2d at 608. The moving party's burden was set forth in *Clark* as follows:

> The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex*

> did not change the general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. Even after *Celotex* it is never enough to simply state that the non-moving party cannot meet its burden at trial.

*Id.* (citing *Celotex*, 477 U.S. at 323-25, 106 S. Ct. 2553-54).[1] In other words, the moving party must demonstrate that its motion is due to be granted before the burden shifts to the non-moving party to demonstrate an issue for trial.

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)); *see Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's

---

[1]The Eleventh Circuit recognized that *Celotex* created "an exception to the *Adickes* [*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)] rule for [an] ***uncommon*** situation," i.e., "when neither party could prove either the affirmative or the negative of an essential element of the claim." *Clark*, 929 F.2d at 607, 608 (emphasis added). In this "uncommon situation," the *Celotex* exception allows a moving party to carry its burden by showing or "pointing out," by reference to record, that the non-moving party cannot prove its claim. *Id.* at 607.

opposition." *Id.*; *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995).

In resolving whether a given factual dispute requires submission to a jury, the Court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55, 106 S. Ct. at 513. The Court, however, must not weigh conflicting evidence for probity or make credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. The court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993)(citations omitted). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *EPL, Inc. v. USA Federal Credit Union*, 173 F.3d 1356, 1360 (11th Cir. 1999)(quoting *Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1369 (11th Cir. 1982). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## II. BACKGROUND[2]

Mr. Sibley was employed by PEI Electronics at the time of his retirement in April 1998. At the time of his retirement, he was covered by three disability policies issued by UNUM: (1) a short-term disability policy; (2) a long-term, group disability policy; and (3) a supplemental long-term disability policy. He claims benefits pursuant to the supplemental long-term disability policy; the other two policies are not at issue in this case.[3]

Mr. Sibley contends that he had disability insurance since 1990. At that time, apparently, AETNA Insurance provided the employee disability insurance coverage. In December 1996, UNUM had taken over PEI Electronic's employee disability insurance plan. PEI Electronics sent a memo to its salaried employees, which stated:

> PEI Electronics is pleased to announce a Supplemental Disability Plan to be made available to all Salaried employees. Management's assistance in making this available for our employees is in recognition of a general need for a more reliable and substantial source of permanent income (in the event of an extended sickness or disability) than is offered under our group Long Term Disability Plan.
>
> This new plan will allow all eligible employees the opportunity to protect a greater percentage of net income in the event of a long-term disability. PEI Electronics has negotiated substantial discounts with the world[']s leading provider of disability insurance, UNUM Life Insurance Company of America.
>
> Few individuals have sufficient resources to maintain today's costs for housing, food, transportation, etc. An extended time away from work could be financially devastating for any employee[;] thus PEI Electronics endorses this new plan and we hope that you will seriously consider this new coverage

---

[2]Because Mr. Sibley is the non-moving party, all disputed facts are resolved in his favor and all reasonable inferences arising from those facts are drawn in his favor.

[3]The Court notes that Mr. Sibley is currently receiving benefits pursuant to the long-term, group disability policy.

for the financial security of you and your family.

Pl. Exh. 3.

Around the time this memorandum was sent, W. Thomas Younger, an insurance broker, made a presentation to PEI Electronics employees. Def. Exh. B ¶ 1. Mr. Younger contends that he explained the different policies to the employees, indicating that the employees were guaranteed coverage under the long-term, group disability policy, without exclusions for pre-existing conditions, if the employees had been covered under the previous plan. *Id.* ¶¶ 2-3. He also stated that he had explained the supplemental long-term disability policy, which was to be "medically underwritten." *Id.* ¶ 4. He stated that he had told the employees that they were guaranteed an "offer" of coverage, meaning that an employee would get "some" coverage, i.e., with exclusions, despite his or her health. *Id.* ¶ 5. Mr. Younger's testimony regarding the substance of his statements is corroborated by affidavits from two other PEI employees: John Hudgens (Def. Exh. C) and Bill Collins (Def. Exh. D). The record does not contain sufficient information to dispute the accuracy of Mr. Younger's testimony regarding his statements at this meeting. Mr. Sibley contends that he "thought they were going to underwrite us all," but he does not remember the possibility of exclusions to the supplemental policy for pre-existing conditions coming up in the meeting. Pl. Depo., pp. 89, 110-12

Mr. Younger prepared a "Disability Income Proposal" for Mr. Sibley, which showed him the premiums for disability coverage, group and individual, replacing 100% of his income ($5,900 per month) should he become disabled, with a 25% discount because Mr. Sibley did not use nicotine. Pl. Exh. 3. Although the quality of the copies supplied to the

Court is poor, it does appear that the "Disability Income Proposal" states on its face that it is "for illustrative purposes only," and that "[t]he contract will be the final agreement on premium . . . ." *Id.*

On December 9, 1996, after receiving written notice from Mr. Sibley indicating his interest in participating in all the voluntary benefits offered through PEI Electronics, including supplemental long-term disability insurance (Pl. Exh. 3), PEI notified Mr. Sibley as follows:

> PEI Electronics, Inc. is pleased to advise you that you are eligible to participate in a Supplemental Individual Disability plan, in addition to your current employer provided coverage. This program is available to you at a substantial discount and reduced underwriting because of your employment at PEI Electronics. . . .
>
> . . .
>
> PEI Electronics has secured an offer which guarantees ***some*** coverage will be issued. We encourage you to participate.

Pl. Exh. 3 (emphasis added).

Thereafter, Mr. Sibley and Mr. Younger, together, completed an "Application for Disability Insurance" in Mr. Sibley's name. Def. Exh. E; Pl. Depo., p. 91. The application contained numerous medical questions and a disclosure authorization, signed by Mr. Sibley, allowing UNUM to acquire information about Mr. Sibley's health and financial state. Def. Exh. E.

In January 1997, Mr. Sibley was hospitalized with chest pains. At this time, it was discovered that two heart bypasses he had received in 1994 had closed and he was required to undergo a heart catheterization. Pl. Depo., pp. 108, 136-37.

In March 1997, Mr. Sibley was diagnosed with sleep apnea. This malady was treated with CPAP. Pl. Exh. 5.

On May 5, 1997, Plaintiff's heart physician, Dr. Cash, recommended that he take a disability retirement. In a letter, he wrote:

> Thomas Sibley had a large myocardial infarction three to four years ago. He was in cardiogenic shock and he remained in the hospital three or four months at the time that he required emergency bypass surgery. His recovery has not been adequate. He has chest discomfort while working at low levels of activity. He had a stress test in December of 1996, at which time he had angina that required stopping at a heart rate of around 100, with less than 5 minutes of exercise.
>
> Mr. Sibley has had progression of his coronary disease since his bypass surgery, with closure of one or more bypass grafts.
>
> I feel that Mr. Sibley's prognosis is poor. I think it would be entirely appropriate that he take a medical retirement, and I think, for the future, the probability of sudden death or recurrent myocardial infarction is high. Therefore, I am speaking in support of his application to seek disability compensation, and I think that working as he presently does is detrimental to his health.

Pl. Exh. 5. Mr. Sibley continued to work.

On May 14, 1997, Mr. Younger and Plaintiff met and went over the supplemental long-term disability policy from UNUM. Attached to the policy was the following "Exclusion Rider:"

> I . . . have carefully read this exclusion Rider and I understand and agree that:
>
> 1. this Exclusion Rider amends all coverage under the referenced policy by limiting or excluding certain coverage or benefits otherwise available under the policy or coverage described above, regardless of contrary statements appearing elsewhere in the policy;
>
> 2. under the terms of this Exclusion Rider, no benefit of any kind or

amount is payable to anyone for any loss, impairment or disability due to, contributed to by, or resulting from

DISEASE OR DISORDER OF THE HEART OR BLOOD VESSELS OR ANY TREATMENT OR COMPLICATIONS THEREOF;

DIABETES, RETINOPATHY, NEUROPATHY, OR NEPHROPATHY INCLUDING ANY TREATMENT OR COMPLICATIONS THEREOF;

3. once this Exclusion Rider is signed, it binds all persons claiming any interest under the policy.

Pl. Exh. 6. Plaintiff told Mr. Younger that he did not want a policy under the conditions set forth in the Exclusion Rider; he wanted the policy he had been "promised" as evinced by the "Disability Income Proposal." Pl. Depo., pp. 117, 124 UNUM offered to refund his premiums; Mr. Sibley refused. *Id.* at 124-25.

Plaintiff told Mr. Younger that he was going to consult a lawyer regarding whether to accept the policy now being offered by UNUM. Pl. Depo., p. 107. After talking with a lawyer, Mr Sibley accepted the policy offered and signed the Exclusion Rider. *Id.* at pp. 114–19.

Plaintiff contends that he signed the rider to preserve his right to benefits. His deposition testimony is as follows:

Q. . . . Your attorney encouraged you to accept these policies?

A. Said I had to take it in order to have a claim.

Q. I'm not sure I understand that.

A. In short, if I turn down the policy I would have no policy.

Q. Right. I'm not sure what you mean by a claim.

A. At that time, my health condition was not a big secret. I had a

major heart attack in '94. I had undergone another catheterization in January of '97, late January. My prognosis was very poor.

Q. Tell me what you mean when you say you were told that you had to accept the policy to have a claim.

A. In short, I would not have a policy – if I did not accept that policy and pay a premium, I would be entitled to nothing.

. . .

A. I was being forced into accepting the policy as written rather than get you [UNUM] to modify it because you weren't going to do it, you weren't going to change your policy.

. . .

Q. . . . What efforts did you go to have UNUM modify the policy?

A. I protested to Mr. Younger but it wasn't going to change anything.

Pl. Depo., pp. 108-109. Indicating the Disability Income Proposal, Mr. Sibley testified that this form was UNUM's "promise." He testified that he believed everyone would be covered by all offered forms of UNUM disability insurance regardless of existing medical conditions.

In April 1998, Mr. Sibley left PEI on a medical retirement. He testified that he was disabled due to:

> The heart failure. Diabetes, I'm a type two diabetic. That aggravates things. And the sleep apnea. That has been medicated, but I was literally falling out of my chair in '97.

Pl. Depo., p. 140-41. A note from Mr. Sibley's primary care physician, Dr. Lori kaufman, stated that she had recommended "long term medical disability due [to] congestive heart failure, sleep apnea, [and] progressive fatigue." Pl. Exh. 5.

Mr. Sibley filed a claim for disability benefits. In this claim, he stated that he was

disabled due to:

> Heart attack after angioplast[y] on 26 January 1994. Heart catheterization on 23 January 1997 disclosed by-pass had closed. March 1997 ankles began to swell due to heart failure. Sleep apnea caused constant fatigue.

Pl. Exh. 5.

UNUM denied Mr. Sibley's claim for benefits under the supplemental long-term disability policy; his request for benefits under the group long-term benefits plan was approved. UNUM denied Mr. Sibley's claim due to the terms of the Exclusion Rider, excluding coverage for disability "due to, contributed to by, or resulting from disease or disorder of the heart or blood vessels or any treatment or complications thereof . . . ." Pl. Exh. 6; Def. Exh. G, p. S–0470. With regard to Mr. Sibley's claim that he was disabled due to sleep apnea, UNUM wrote:

> Based on our review of your treatment records, it appears that your restrictions and limitations are a result of your heart disease. There is mention of sleep apnea [that] appears to have been treated with CPAP with success. However, there is no indication in the treatment records that this is impairing your functional capacity.
>
> Unfortunately, as your restrictions and limitations appear to be the result of your heart condition, and your policy does not provide coverage for heart related problems, it does not appear that any benefits are payable under your individual [supplemental long-term] disability claim. However, in order to extend you the utmost consideration in this matter, we are obtaining treatment record from Dr. Paul Legrand [sic] for review. We will inform you of the results of this review once it has been completed.

Def. Exh. G, p. S-0470.

After reviewing Mr. Sibley's treatment records for 1997, UNUM concluded that the treatment of his sleep apnea was successful and that "[t]he sleep apnea syndrome does not appear to be a significant contributor to impairment at the present time and this

condition does not strongly support disability from a medical view point." Def. Exh. G, p. S-0496; *see also id.* at S-09497. On October 5, 1998, UNUM denied Mr. Sibley's claim for supplemental long-term disability benefits and "conclud[ed] [the] handling of [Mr. Sibley's] individual disability claim." Def. Exh. G, p. S-0497.

The record contains a letter to Plaintiff from Dr. Paul LeGrand, dated October 13, 1998 (a week after UNUM closed its file on Plaintiff's individual disability claim), which states:

> I wanted to write and thank you for coming by the Sleep Disorders Center in follow-up of your sleep disordered breathing.
>
> As you recall, you were initially tested back in 3/26/97 and found to have severe sleep disordered breathing with respiratory disturbance index of 60 per hour and oxygen level drops to 72%. ***This was markedly improved with nasal CPAP 11cm, reducing the respiratory disturbance index to near normal levels with slight oxygen drops***. Subjectively, you have indicated that you are improving as well in terms of your excessive daytime sleepiness function.
>
> I am concerned, as are you, with your continued symptoms of edema formation suggesting left ventricular dysfunction. You have justifiable concern, I believe, as to the sleep apnea contributing to hypertension and worsening your congestive heart failure. Hopefully, ***at this point, we have limited this to very small incremental changes or even better, we would have hoped to resolve it***. Certainly, this is only part of the constellation of findings which may be inducing your impairment as alluded to above.

Pl. Exh. 5 (emphasis added). The record does not contain evidence UNUM received this letter.

## III. DISCUSSION

The parties agree that the supplemental long-term disability policy under which Mr. Sibley claims benefits is an ERISA plan.

Congress enacted the Employee Retirement Income Security Act of 1974 to establish federal guidelines for the creation and maintenance of employee pension and welfare benefit plans in order to protect the pension and welfare benefits of employees and their beneficiaries. *See generally* 29 U.S.C. § 1001 (Congressional findings and declaration of policy). The Act accomplishes this purpose by imposing detailed requirements on specific, statutorily-defined persons having some relationship with an employee benefit plan. *See* 29 U.S.C. § 1002 (Definitions). Section 502 of the Act, 29 U.S.C. § 1132, provides that certain designated persons are empowered to bring a civil action against other persons, which – because of their status – have some special duty imposed on them, to enforce the requirements of ERISA. *See* 29 U.S.C. § 1132.

Congress did not establish the standard of review for actions challenging benefit determinations in ERISA-regulated plans. The Supreme Court, however, has held that federal courts should review benefit determinations *de novo* "unless the plan expressly gives the administrator discretionary authority to make eligibility determinations or to construe the plan's terms." *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 38-39 (11th Cir. 1989); *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114 S. Ct. 948, 103 L. Ed. 2d 80, 95 (1989). If the plan specifically provides the administrator with discretionary authority, federal courts should apply the more deferential arbitrary and capricious standard of review. *Guy*, 877 F.2d at 39; *see also Arnold v. Life Ins. Co.*, 894

F.2d 1566, 1568 (11th Cir. 1990)(Johnson, J. dissenting). The Eleventh Circuit Court of Appeals has held that a federal court should review decisions of a plan administrator under a *de novo* standard when the plan is silent as to the administrator's authority to construe the plan and and is silent or ambiguous as to the administrator's discretion. *Kirwan v. Marriott Corporation*, 10 F.3d 784, 788-89 (11th Cir. 1994).

The plan at issue in this case is silent as to the administrator's authority to construe the terms of the plan. Moreover, the language cited by UNUM as a grant of discretionary authority appears to be no more than an indication of UNUM's administrative authority to determine claims; there are no words indicating that this determination is to be accorded deference. *See Id.* at 789. Therefore, this Court will review *de novo* UNUM's decision to deny Mr. Sibley's claim for benefits.

**A. TERMS OF THE CONTRACT – Coverage of Mr. Sibley's Heart Condition**

Mr. Sibley contends that he was offered and he accepted a contract for supplemental long-term disability that did not exclude pre-existing conditions, such as his heart condition.

**1. Continuity of Coverage**

This Court will not linger over Mr. Sibley's argument regarding a continuity of coverage provision in his supplemental long-term disability policy, prohibiting the exclusion of pre-existing conditions. The evidence presented by Mr. Sibley refers to a continuity of coverage provision in the ***group*** disability policy. There is no evidence that UNUM ever included, or intended to include, a continuity of coverage provision in the individual, supplemental long-term disability policy.

**2. Application as "Offer" to Contract**

Mr. Sibley contends that UNUM offered him supplemental long-term disability coverage without exclusions during the application process and that he accepted this offer and made premium payments, only to have UNUM "retroactively and unilaterally change the agreement when it presented a policy on May 14, 1997, which was different from that which Sibley had accepted." Pl. Brief, p. 10.

The threshold issue is whether UNUM and Mr. Sibley ever had a contract for supplemental, long-term disability coverage without exclusions for pre-existing conditions. The answer is quite simply no.

ERISA is a "comprehensive and reticulated statute." *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361, 100 S. Ct. 1723, 1726, 64 L. Ed. 2d 354 (1980), *quoted in Horton v. Reliance Standard Life Insurance Co.*, 141 F.3d 1038, 1041 (11th Cir. 1998). Nevertheless, ERISA's text does not address all possible issues. Therefore, "Courts have the authority 'to develop a body of federal common law to govern issues in ERISA actions not covered by the act itself.'" *Horton*, 141 F.3d at 1041 (quoting *Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285 (11th Cir. 1990).

The parties have not directed the Court to any provision in ERISA dealing with the particular issues before it. However, the Court notes that the law is well-established that "[a]n application for insurance is an offer to enter into an insurance contract, and if the insurer issues a policy materially different from that applied for, the policy is a counter-offer which becomes binding only when accepted by the applicant." *Connell v. State Farm*

*Mutual Automobile Insurance Co.*, 482 So. 2d 1165, 1167 (Ala. 1985);*see also* 44 C.J.S. Insurance §§ 273-75; 1 Couch on Insurance § 11:7 (3d ed.).

None of the documents provided to Mr. Sibley prior to his receipt of the supplemental long term disability policy are sufficient to constitute an offer of coverage without exclusions for pre-existing conditions. The schedule showing Mr. Sibley the amount of the premium for supplemental, long-term disability coverage, which Mr. Sibley contends is an offer, clearly states that it is for "illustrative purposes only" and that the "contract will be the final agreement on premium." The application itself contains definite language that the application is an offer. For example it refers to "proposed insured." It contains a statement that UNUM is relying upon the information in the application "to determine whether to provide the requested coverage." It also states, "no agent, producer, medical examiner or anyone other than a Home Office underwriter may waive questions asked or answers given in this application or the medical exam; ***determine if I am eligible for a policy***; make, or promise that I will be issued a policy of insurance; or change or waive any rights or requirements of the Company." The application included a provision authorizing disclosure of Mr. Sibley's medical information to "be used to underwrite my application for insurance . . . ."

As a result of its review of Mr. Sibley's application and medical information, UNUM excluded from coverage disability "due to, contributed to by, or resulting from" his pre-existing heart condition or diabetes. Plaintiff signed the exclusion rider and, thus, accepted the limited coverage. He was given the opportunity to reject the policy or accept it on UNUM's terms. Plaintiff accepted the policy; however, he contends he did so only under

protest.

There is no legally sufficient evidence that UNUM ever offered Mr. Sibley a guaranteed supplemental long-term disability policy with no exclusion for disability "due to, contributed to by, or resulting from" his existing heart condition. Moreover, Mr. Sibley accepted the policy offered.

Plaintiff's supplemental long term disability policy clearly and unambiguously excludes coverage for disability due to or related to his heart condition. Therefore, Plaintiff's claim for unpaid benefits for long-term disability caused by his heart condition was correctly denied by UNUM.

**B. DISABILITY DUE TO SLEEP APNEA**

Mr. Sibley also claims that he is entitled to benefits under his supplemental, long-term disability policy because he is disabled by sleep apnea, which is not an excluded condition. However, the language in the policy excludes disability "due to, contributed to by, or resulting from" the excluded conditions. Therefore, in order for Mr. Sibley to be awarded benefits under his supplemental long-term disability policy, he must be disabled from sleep apnea, without reference to his heart condition or his diabetes.

**1. Consideration of New Evidence**

It appears that Mr. Sibley has submitted evidence to this Court that was not before UNUM at the time it made its decision that Mr. Sibley was not disabled due to sleep apnea. The record contains a letter from Mr. Sibley's doctor, Dr. Paul LeGrand, dated October 13, 1999. UNUM apparently closed the file on Mr. Sibley's claim on October 5, 1999. "In this circuit, a district court conducting a de novo review of an Administrator's benefit

determination is not limited to the facts available to the Administrator at the time of the determination." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir. 1994). Therefore, this Court will consider the October 13, 1998 letter from Dr. LeGrand in determining whether benefits are payable to Plaintiff.

**2. Application of the Terms of the Policy to Mr. Sibley's Evidence of Disability due to Sleep Apnea.**

Under the policy, Mr. Sibley is "disabled" if – as a result of sleep apnea –

1. [He is] unable to perform the material and substantial duties of [his] regular occupation; or

2. [He is] unable to perform some, but not all, of the material and substantial duties of [his] regular occupation; or

3. [He is] able to perform the material and substantial duties of [his] regular occupation but [he is] not able to work full-time in [his] Regular Occupation; and

4. [He is] receiving Medical Care.

Def. Exh. E, p. 7.

As of October 1997, after being treated for sleep apnea for a little more than six months, Mr. Sibley reported that he was more alert and less exhausted during the day; he reported being tired but attributed this to his cardiac condition. In October 1998, Dr. LeGrand indicated that Mr. Sibley was "markedly improved" and that his sleep apnea contributed to a worsening of his heart condition and hypertension in a very small way or not at all. The medical information in the record does not indicate that Mr. Sibley was disabled due to sleep apnea under any definition in his policy.

Plaintiff points to a note from his primary physician, Dr. Kaufman, which states,

simply, "I have recommended long term medical disability due [to] congestive heart failure, sleep apnea, and progressive fatigue." This note is dated April 9, 1998. He also directs the Court to evidence from Dr. Cash, who treated his heart condition, who lists sleep apnea as one of Mr. Sibley's "problems" in a letter to UNUM dated April 27, 1998. Neither physician contends that Mr. Sibley's sleep apnea -- alone or in combination with another condition not excluded from coverage -- resulted in his disability.

Indeed, the Court finds that the evidence clearly indicates that Mr. Sibley was not disabled by sleep apnea, the conditions having responded well to treatment.

There being no proof of Mr. Sibley's claim that he is disabled due to sleep apnea, Mr. Sibley's claim was properly denied. Defendant's Motion for Summary Judgment is due to be granted.

## IV. CONCLUSION

Based on the foregoing, the Court finds there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law.

DONE this 29th day of November, 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE